United States v. Kudinatov, case number 25869. And I understand that there's some students from the Aviation High School here. If you're from the Aviation High School, raise your hands. Oh, great. Well, welcome to the Second Circuit Court of Appeals. It is a public proceeding and we hope you all learned something. And I'm sure with the quality of counsel this So let's start. Ms. Shapiro, good morning. Good morning. And may it please the Court, my name is Alexandra Shapiro and I represent the appellants. Thirty years ago, this Court held that constitutional standing to challenge civil forfeiture is a low bar. Claimants need only assert a facially colorable interest to get in the courthouse door. As the Court has repeatedly emphasized, that's because what is being adjudicated is the government's right to the property, not the claimant's. In the test, which has been reaffirmed numerous times, including twice last year in Ross and the Inouye Philippine forfeiture, only requires an allegation of ownership and some evidence of ownership when the basis for standing is claimed to be ownership. Whether the claimant ultimately proves existence of that interest is a question for the merits. Here, the claimants clearly met that test. They held title and were the registered owners of the yacht and originally commissioned, used, and continuously managed it for several years. But the district court erroneously denied standing because it applied too onerous a test. This denied claimants their day in court and the order should be reversed and remanded. Your Honor, is the test in what way? Is it because it applied a preponderance test or it applied in what way? No, Your Honor. It's because it applied a dominion and control test and declined to apply the facially colorable interest test. That test was satisfied by the verified claim itself. And by the demonstration that is now undisputed that the claimants held title as well as the history that I described earlier. So is there at any point during the proceedings that the dominion and control test ought to apply in your view or is it Article III standing and so it's always the facially colorable interest test that applies? The facially colorable interest test is what applies to constitutional standing. That's, you know, what this court held in Torres, in 557, in Cambio-Exacto, in Ross, in Nenre, Philippines. That's been the test for 30 years. And, you know, the sham owner cases involve a different context and that typically doesn't come up, the dominion and control, until later in the proceedings. If it's relevant at all. That's my question. When you say later in the proceedings, at what point in the proceedings does the sham owner or some dominion and control test arise or apply in your view? Well, if it applies at all, it would be at the merit stage if someone, for example, as in some of the cases, was claiming to be an innocent owner or something like that. But not in this context, we're done. And I think 557 is pretty clear in that regard because there then Judge Sotomayor explained the posture there was that after a trial on the merits, the district court had revisited standing and this court said in that opinion that that was inappropriate. But that was inappropriate because of the timing, right? And so when can we? You're telling us we can't visit, we can't go to the yacht. What should happen here is that the case should be remanded for trial on the merits. At the trial on the merits, the government has the burden of proving that the yacht was legally seized. And in connection with that, if it could prove that Mr. Karamov is the real owner of the yacht and that, therefore, this $1 million worth of transfers is a violation of the sanctions, then it would establish its right to seize the yacht. And so it would be at that point in the trial on the merits if it could – it has to prove that the sanctioned party owns the yacht. So let's talk for a minute. Let me ask you this. Why wasn't the evidentiary hearing that the court had sufficient? Well, the – because there should never have been an evidentiary hearing, the court shifted the burden. We had standing. The purpose of rule – the context in which Rule G would allow an evidentiary hearing solely for standing would be if there was a disputed fact as to the application of the facially colorable interest. So, for instance, you know, suppose the asset is a piece of jewelry found in a safe deposit box. And, you know, the claimant says, I own the safe deposit box, but there's a factual dispute about whether the claimant owns the piece of jewelry or somebody else owned it. Then maybe the court would need to hold an evidentiary hearing. But here you're dealing with a yacht and something where there's legal title. It's got to be registered in the Cayman Islands. There's a transfer of title. There are various documents that have to be transferred during a closing, which everyone agrees never occurred. Well, doesn't the agreement say it will occur by November, though? But it didn't occur here. And this is very different from the only cases this court in which this court has ever found a sham owner at this stage, which was the 500 Delaware Street case. And in that case in which the court didn't even mention the facially colorable interest test, by the way, which was subsequently reaffirmed numerous times after that case, that case was very different because there was no disputed fact. The claimant admitted that the property had been transferred to him after the actual owner was arrested for drug dealing. So in your view, would hindering the title to the boat have been sufficient to establish a facially colorable interest? Just the title? Yes. And so you put in the title and then you're entitled to a trial? Correct. And the reason is, as this court explained in 557 and reiterated in Ross in the Philippine case, is that the purpose of standing is to ensure that there's a concrete dispute and that the court has jurisdiction. And here the government has brought the claim. And the issue is whether the government should be put to its proof to demonstrate whether it legally seized the yacht. And that's why it's such a low bar in this particular context. That's what this court has repeatedly held. Didn't that happen at the evidentiary hearing? I'm sorry? Didn't that happen at the evidentiary hearing? No. The evidentiary hearing never got to the merits of the government's case. The government did not prove that the sanctioned party owned the yacht. That wasn't the point. But it proved that your client did not. And so that eliminates the case or controversy, the dispute between your clients. That was the upshot of the evidentiary hearing. The findings were whoever owns this, whoever might have an interest, it's not your client's. Respectfully, that's not correct under this Court's cases. The Court's cases repeatedly hold that all a claimant needs to demonstrate at this threshold-only stage is an allegation of ownership and some evidence, which the title was sufficient to establish. So counsel, as I understand it, said we have to prove by ponderance of the evidence a facially colorable interest. Is that correct? That is correct. Okay. So are you saying that that was wrong? No. So I'm concerned about that. So preponderance is. There are two issues. One is the test, facially colorable interest, right? The other is what was the standard? Was it a preponderance? And you're saying it's something less than a preponderance, I think. No, that's not what I'm saying. All right. So what are you saying? I'm saying that the district court didn't apply the facially colorable interest test. And if you look at its opinion, particularly SPA 60 to 63, I think it is, it very clearly states that it takes the view that Rule G altered the test, and that this Court's cases like 557 and Combio and some of the others just have been superseded by Rule G. And I think if you look at other, all of our other arguments in the trial court, including extensive discussion in the post-trial brief, which is at docket 455-1 in the district court, we repeatedly argued that the standard was facially colorable interest, and that all we had to show under this Court's cases, as the cases repeatedly hold, is an allegation of ownership and some evidence, which was satisfied by the title. And then we argued there were numerous other pieces of evidence that satisfied it. But in this context, title alone is sufficient. So tell me, how do you make sense of the language of Rule G, which talks about  Rule G doesn't purport to alter the constitutional test for standing, nor could it. A procedural rule can't alter, you know, and so all it says is. So when it talks about standing, what is it referring to? It's referring to the fact that the district court can resolve standing either on a motion to dismiss, on summary judgment, or if there are disputed facts about standing. So it provides for a procedural mechanism to resolve issues relating to Article III standing. Is that right? That's correct. Okay. So why wasn't this sufficient? Because this is just sort of like any case where you would say, let's say the district court ordered a trial, but in fact should have granted summary judgment, because under the legal standard, the appropriate legal standard, there were no material facts in dispute. So that's the point here, is that the undisputed facts, namely, claimant's title, as well as the fact that it held title continuously leading up to the, even this September agreement, if you accept the district court's finding. Your argument, I think, and I say this respectfully because I'm trying to fully understand it, doesn't even make sense if, of an evidentiary hearing. Why would we ever have an evidentiary hearing if all it takes is an allegation? Because it's, well, it's not an allegation. Why would we even have Rule G, which sets forth this entire architecture with an evidentiary hearing, if all you need to do is make an allegation, and I think that this is what I said, of a facially colorable interest in the property issue. No, that's not what I said. And respectfully, if I could just try to explain this a little better. Apparently, I'm not getting through. But I think I can explain it. And that's going to be, by the way, my fault as much as yours. Go ahead. Well, I'd like to try to clarify, because I think this is really critical. So what the cases say is that standing is threshold only, and it only requires a facially colorable interest. What the cases also say is that a claimant who is claiming ownership, and by the way, there are different ways one can establish standing. For example, possession, that's a different story. A person claiming ownership merely needs to allege ownership and provide some evidence of ownership. Now, here, in this particular context, we have both of those things, because there's not only an allegation, but a title which is not disputed. And what else? Then what? Let's assume your client does that. Then what? Brandishes the title. This is the title to the book. What then? Well, there should be a trial on the merits. But can I — I want to explain that, in response to Judge Loya's question, the reason Rule G does work is there are many other — many contexts in which a person will file a claim. And you may — in this particular context, we're saying that based on these undisputed facts, the legal test is satisfied, and we were entitled to summary judgment on standing. You may well have other types of cases where there are factual disputes. So, for instance, one of the cases, I believe it was Combio-Exacto, gives a hypothetical that's actually quoted in one of our briefs. You know, you have a situation, let's say, where a passenger is stopped on an airplane and a bag is seized and it contains cash. And the passenger says, oh, that's not my cash, even though it's my bag, and then later comes in and tries to challenge the forfeiture and claim the cash. So there's a factual dispute because the claimant themselves has talked out of both sides of their mouth, if you will. You could have an example like the safe deposit box example I gave earlier. So you can certainly have situations in which there is still a factual dispute. Here, the reason there isn't one is that it is now undisputed that we held titled it is now undisputed, even additional evidence is undisputed, which is that we continuously, you know, we commissioned the audit, we designed it, et cetera. What's the harm to your client from forfeiture? Your client, what do they suffer? What's the loss? They suffer loss of the value of the yacht. And what is the value of the title? And the value of the title in this case, I'm trying to figure out what it is, because it looks to me like the September 2021 MOA says your clients can't sell it. So what's the value of that title? Other than the paper it's printed on. Well, this is a yacht. I mean, we're not. But they don't have control of it. They're not allowed to sell it and monetize it, and they've given exclusive use to another party. So they don't have use of it, and they don't have the ability to sell it. No, the legal title gives them the right to the proceeds from the yacht. Now, whether it – Wait, wait, wait, but they're not allowed to get proceeds. They're not allowed to use it, and they're not allowed to sell it. Am I misreading the MOA? I think you are, Your Honor. Okay, about 36 and 39. 34 and 39 don't say they can't sell it? Nobody can sell the yacht without title. So if – so – and the legal title they hold, and this is really undisputed, is they hold legal title to the yacht. But that is the entire idea of sham owner. I hold the title, but I have no control, nor do I have any actual financial interest. That was the – That's not true. We do have a financial interest. We hold the title to the yacht. In fact, the government, as I understand it, has since sold the yacht, and they have assured counsel that if we win the appeal, the claimants – and we win a trial in the merits below, the claimants would be entitled to the proceeds from that sale. So – Notwithstanding the MOA. That is – that – it's legal title. It's like if I sell my house to you, and we sign a contract, and the deal never closes, and the title hasn't actually been transferred, and the government comes and seizes the house, and it's determined that that was illegal, I get the house back. But this deal did close. It didn't close. It's undisputed that it didn't close. The complete – 225 million euros was transferred. The MOA was signed, and everybody performed, other than that paragraph about changing – you know, re-registering the boat. Everything else was performed under that contract. Well, first of all, this Court doesn't need to reach this question, but there was plenty of evidence that contradicted that, which we've discussed a little bit in our brief. But putting that to one side, it did not close. It's undisputed that it didn't close. Two lawyers, Cayman Islands lawyers, testified, and this aspect was completely uncontested, about the various documents that need to be transferred when title is transferred and to close the sale of a yacht in the Caymans, and that that never occurred. And, in fact, you know, so that is absolutely critical. We're talking about a $300 million asset. We're not talking about – So let me ask you this. What is it that – you presented the title. You took the position below that this was sufficient at this stage of the proceeding for prima facie evidence of your ownership. The government gets up and says this is a sham title. They have a paper title, but they don't have any other indicia of ownership. So the judge orders an evidentiary hearing on that dispositive, it seems to me, issue. What was – what's your position that there was something wrong with that proceeding? Because – And you had – this was after discovery. Because we had already satisfied the test for standing. So the next step is a trial. And there's a dispute about this, but we believe it's pretty clear we're entitled to a trial by jury. And so – and that's the merits. And to the Senate, it relates to the merits. We demonstrated standing. And as the Seventh Circuit case – If you had – let's put aside the question of whether you were entitled to a jury trial. If you were not, why didn't the hearing that the judge conducted give you all the process you were due? Because, as we've set forth extensively in our briefs, the government used this bizarre burden-shifting framework and disregarded basically all our evidence. And it was essentially – Or disregarded the minimum evidence that you put forward. No, he disregarded all of our evidence. He threw out all of the evidence that we had demonstrating that what the government claimed was a contract of sale was, in fact, not one. He threw out all the evidence that we put forward showing that the boat was, in fact, chartered and that the purpose of the September agreement was to enable Imperial Yachts, which had been trying to sell – broker a sale on behalf of the claimants, would actually continue to do so through charters and so forth. The district court threw out all of the evidence of all of that. Your view is that – just to recapitulate – bare title with some assertion of ownership suffices to establish a facially callable interest. That is our view, and it's also – What is the best second-circuit case that you have for that view? You mentioned 557, I don't know that it does that, but what is the best second-circuit case? Well, 557, Cambio, Xacto, Ross, Philippine, all of them say that all you need is an allegation and some evidence. And I will say that the Court doesn't even have to go that far, but I think that's the correct rule, because there's more than title even on the undisputed facts. It's undisputed here that we commissioned the yacht, that we designed it, that we managed it for years. This is very different. The undisputed part is the MOA, which seems to have transferred all interests except for title. But the point I was making respectfully is this. The only case in which this Court has ever affirmed a standing determination remotely similar to this where somebody actually claimed to have title, it was conceded by the claimant not only that it was sham, but that it was a sham ab initio, that the title was transferred. The person never held – didn't have any continuous use. The property was only transferred to him after the true owner was arrested. But this is – that's why this is very different, because it was our yacht from day one. But you had a chance to make all these arguments and induce whatever evidence you wanted before the district judge, and he heard it and believed some, didn't believe others, and reached a conclusion. But he applied the wrong legal standard. He should not – and he's – he engaged in this dominion and control analysis, which is not appropriate for standing. That's what all this Court's controlling case law says. And if this Court affirms here, it just makes it even more likely that in future cases the government will continue to do what it did that led to CAFRA in the first place, which is abuse the forfeiture statutes. And the – So, Ms. Shapiro, you reserved some time for rebuttal. Thank you. I appreciate it very much. We'll hear from the government. Good morning, Your Honor – Your Honors. And may it please the Court, Jennifer Jude for the United States. As this Court explained in United States v. Cambio-Exacto, in a forfeiture action, courts deny standing to straw owners because they do not suffer an injury when property is taken from them. Here, it is uncontested that it's claimant's burden that they have to carry by a preponderance of the evidence to show that they are more than mere straw owners. And after a four-day fact-finding hearing based on an overwhelming amount of evidence presented over four days, the district court found that by September 2021, claimants had divested themselves of every – So, your friend says that the district court actually applied the wrong standard, the dominion and control standard or test, rather than the facially-colorable interest test. And I think that that was the focus of a large part of the argument. What is your response to that? Our response is that one way of satisfying facially-colorable interest standard is to show that you are more than a mere straw owner. This Court's case law is very clear. 500 Delaware Street. Say that again. One way of satisfying the facially-colorable interest standard is to show that you are more than a mere straw owner. So, as the Court said in Cambio-Exacto, the heart of the inquiry is injury. Is the inverse of that also true, that you can show a facially-colorable interest by showing you're more than a straw owner? The converse would be you cannot show a facially-colorable interest unless you disprove that you're a straw owner. So, straw owners cannot have a facially-colorable interest, but there are other ways of showing that you have a facially-colorable interest. For example, you can have a possessory interest. But once the straw owner specter has been raised, it's your position that the claimant has, not only that the claimant has the burden by a preponderance to show they're not a mere straw owner, but also that they conceded below that that's their burden. That's correct, and that's the law from this Court in 1st 500 Delaware Street in 1997, and then reaffirmed in Cambio-Exacto and also in a summary order, I think the United States v. 829-something thousand dollars. It's also the law in every other circuit that has reached this issue. What about this idea that it's the government that's the plaintiff, so it's the government that has to assert standing here? And this idea that I sort of sprinkled throughout the claimant's argument that standing is sort of, in some ways, a misplaced concept because they're not the plaintiff. Standing is a requirement in every case. It's an Article III requirement. The government certainly has a large burden to prove forfeiture, but every claimant has to have standing to participate in a forfeiture action. When you challenge a forfeiture, then you've got to show you've got some standing or interest in whatever the property is that's going through the forfeiture proceeding. That's correct. Sort of like an adversary proceeding. You have to have a legitimate claim to get in the door. Is that the idea? That is correct, yes. And as I mentioned and as counsel mentioned as well, ownership is one type of claim you can assert. You can assert other types of claims that have been recognized as valid for Article III purposes. So it is true that, as Mr. Shapiro said, that in the ordinary course we require very little of a plaintiff or anyone making a challenge with respect to showing or establishing Article III standing, very little, usually just an allegation that on its face seems to establish standing. Why is it different here, and what work is Rule G? So two separate questions, forgive me. But what work then is Rule G doing? What is Rule G there for? So I would agree that it's a threshold showing. It's not what's required for the merits and that it's, you know, it is not a particularly high burden. But it wasn't met here. And all that claimants had to show was that they had a connection to the Amadea beyond mere title, and they were not able to do that, and there's extensive factual findings explaining exactly why. So we've already foreclosed the argument that bare title itself is enough for Article III standing. So whoever the challenger is needs to say a little bit more, show a little bit more than just bare title. That's correct. And, you know, as Lujan explains, the way that you have to show it changes depending on the stage at which the standing inquiry is being made. So under Rule G, there's three ways that the government can challenge standing through a motion to strike. It's on the pleadings, it's via a summary judgment motion, and it's through a fact-finding hearing. And ultimately, it's claimant's burden, and the burden has to be carried by a preponderance of the evidence. Here we filed a motion to strike asking for this to be resolved on summary judgment. The district court considered that, held that there were factual disputes largely created because of Mr. Kudinatoff's declaration, and that a fact-finding hearing was necessary to resolve those disputes, and then scheduled and held a fact-finding hearing and, you know, resolved the evidence on a preponderance standard. So, again, that goes against the ordinary course with respect to Article III. Understanding that we've got Rule G, that you'd have, after a determination that there's a factual dispute about Article III standing and the nature of the title and who actually holds the title there, you'd then have an evidentiary hearing about it. Because Article III, again, is, you know, we're looking for the whatever gets you into a court. So if you were someone like me and you favor access to courts, then your argument doesn't totally make sense. So standing is sometimes determined after fact-finding in other contexts as well, not just in forfeiture cases? And standing one way or the other, so you can lose standing. Correct. Right. Yes. And Rule G, you know, perhaps it is because of the nature of forfeiture that there is a concern, and this is mentioned throughout the case law, that there are, you know, people are going to read about the forfeiture action and that are going to file false claims and that that is going to, you know, be an impediment to the sort of orderly procedure needed to resolve forfeiture cases. That Rule G sets up a specific procedure for dealing with the issue of standing and allows the government to move to strike. It specifically states that a motion to strike has to be resolved before a motion to dismiss, making sure that this threshold issue is resolved before the merits. May I go back to the sort of one of the initial issues about the dominion and control test? And what you said is that that is one way to show a facially colored warrantress. Is that correct? That's correct. And if I can clarify, because I think one point of dispute between the parties is exactly what test the district court applied, because counsel cites to the Tuttle Hill Road case from the Seventh Circuit, which said that dominion and control, as applied by the district court in that case, was too onerous. But in this case, the district court didn't look merely to see whether claimants could show that they had dominion and control over the yacht, but whether they had any indicia of ownership other than mere title. So it looked at dominion and control. It looked at possession. And it looked at financial stake. And the facts of the Tuttle Hill Road case were such. And, by the way, those issues were vetted during this evidentiary hearing? All of those specific factors were looked at by the district court. And there was evidence at the evidentiary hearing. And there's detailed factual findings in the district court's opinion about, you know, possession, whether claimants had shown that they had possession after September 2021. They didn't. And they didn't set foot on the yacht after September 2021. Claimed that they had left some personal property on the yacht. District court found that that was not correct. It looked at financial stake per the terms of the September MOA. The claimants gave away the ability to benefit financially from the yacht through, for example, getting charter payments and also no longer had a responsibility to pay for any of the costs of the yacht, which were transferred to the other party. So financial. What about the insurance costs? Is that? So the one argument that they made was that they were continuing to pay for the insurance costs. But the district court found that the insurance costs were fully paid for before September 2021. And so that is not an ongoing cost that can be credited. So that would be subject to some peer review, presumably. That would be. And that's not being specifically challenged by the claimants on appeal. And what is your best case, the government's best case for, because I've been scratching my head, for this view that you've got to prove standing by preponderance of the evidence at the evidentiary hearing. Do we have a case that says that? I don't believe. I mean, that's what Rule G says. And it's not dispute. The parties don't dispute that you have to prove it by preponderance. Well, all three of this court's straw ownership cases were not hearing, fact-finding hearing cases. For example, Cambio-Exacto and 500 Delaware and I believe also 829,000. I believe those are all summary judgment cases. Yes. We've never dealt, and I'll ask Mr. Shapiro this question too, we've never dealt with an evidentiary hearing where this type of issue about a legal or colorable interest has arisen. Is that correct? I don't think that this court has. I would point you to $8.4 million in the First Circuit as a case to look at for. Is that in the Second Circuit? First Circuit. Yes. I'm not aware of a Second Circuit case that evaluated standing after a fact-finding hearing. This could be the case. Okay. Thank you very much.  Just a couple of quick points. There is no case, and counsel is unable to cite any. There is no case from this Court that holds that dominion and control is the right standard. There is no case from this Court dealing with an evidentiary hearing under Rule G because, frankly, as far as we're aware, this is the first one that's ever been conducted in this Circuit. How is it – how were you prejudiced by the procedures that the district court judge employed? We were prejudiced by those procedures because we never got to a hearing on the merits that we were entitled to before a jury. A jury trial that would put the government to its proof that it had proper legal authority to seize a $300 million yacht to which we continued to hold title. So your position is that once you have made your prima facie showing of standing, then you are entitled to a jury trial to determine the merits of the claim, to determine who owns the boat. That's not who owns the boat. To determine whether the boat was properly seized because the sanctions were violated and the forfeiture stat. And that's a very important point. Go ahead. And so there's no case from this Court that remotely says what my adversary said. This Court has repeatedly said that the inquiry is threshold only, and we clearly satisfied it. So if you then presented the title, is it your position that having done that, you're entitled to a jury trial? Yes. And if you look at 557. So the judge, your position then is that the procedure that Judge Ho employed with this evidentiary hearing, summary judgment and whatnot, was unconstitutional. Correct. It was unconstitutional. And I just want to call the Court's attention to footnote 9 in 557, which I think Judge Merriam may have been alluding to in one of her questions to the government, in which this Court emphasized that because the party invoking Federal jurisdiction bears the burden of establishing standing under Lujan, it might very well be argued that at least as far as Article III standing goes, the claimant bears no burden at all, as it is really the government which is invoking the power of the Federal courts to effect the forfeiture. And that's really what's going on here and why this is threshold only. The last thing we're going to talk about is the threshold. So you accept sunburn. Well, let me just be clear about what happened below. We argued repeatedly. Answer my question first, and then I'll let you. You accept sunburn. In other words, you accept the burden that you've got to show a facially-colorable interest. Correct. Yeah. No, and what I was just going to say is that, you know, counsel talked about the arguments we made to try to satisfy the district court, which was off on this whole thing about dominion and control. And obviously we had to do that in the alternative because that's what the district court was focused on. But, again, I would urge the Court to examine the — I think it's over 100 pages of docket 455. You'll see in that pleading, just as from the outset, we've repeatedly said, facially-colorable interest, it's threshold only. But then we — the judge held this evidentiary hearing, so we argued about all the evidence. But we never conceded the legal — I want to — a moment, the issue of whether you're entitled to a jury trial. I still am trying to get my mind around the fact that why wasn't the procedure that Judge Ho followed sufficient? You wanted a trial, you had a trial. Well, we didn't, respectfully, because there was a burden shifting that went on in this trial. It should have been the government's burden. You know, we've laid out in our papers a number of procedural irregularities relating to the exclusion of essentially all of our evidence. This was not due process. And the judge said that he was merely conducting an evidentiary hearing on standing. I do want to point out that I think two last things, if I may, Your Honor, if you'll indulge me. I think the government is mischaracterizing Cambio-Exacto. In Cambio-Exacto, this Court held that two money transfer emitters whom the district court had said did not have standing, in fact, did have standing, even though they didn't own the funds in question because they were the custodians for the funds and would owe them to their customers. By contrast, it held that another party further down the chain, which didn't have any funds seized by the government, did not have standing. So I think, actually, the facts of Cambio-Exacto are helpful to us. The last thing I want to say is with regard to the insurance policy, it was undisputed that we paid for the insurance and that there were no additional premiums paid by anyone else later. So the policy, in effect, was the one that we were the policy holder. May I ask a question? Yes. So the government says that the dominion control test is actually a form, a way of ferrying out whether there is a colorable interest in that. Judge Ho here applied the various tests in trying to figure out whether there was a there had been established a facially colorable interest in the yacht. What is your response to that? My response to that is that that is an invention of the government and Judge Ho. There is no case from this Court holding anything remotely like that. And the whole notion of it is completely inconsistent with the thrust of all the cases talking about what a low bar and threshold only this is. I guess maybe the question is he analyzed whether there was dominion control, but he also analyzed whether you had satisfied or made out a colorable interest in the boat. But of course, this is all prompted by your view, your position, very strong position that bare title alone is enough to support a colorable interest. Is that correct? That's it. If we don't accept that argument, then I think you don't do it. I don't agree with that, Your Honor, because as I mentioned earlier, I think that is sufficient, but there's more here because we're not talking about somebody who got the title when someone was arrested or the government came in or something like that. We are talking about a party that continuously held an interest for years. But bare title alone is enough to establish a colorable interest. That's your view. That is our view, but my point is there's more than that here. And even if the Court were to reject that view, this would be different from the rare case where title wouldn't be enough because if the Court were to hold that, you know, if title is transferred, like when there's a search warrant or when someone is arrested and it's obviously a sham and it's admitted to be a sham, as in 500 Delaware, this is a very different case even apart from the fact that we continue to hold title and that's undisputed. Thank you very much. Very well argued. Thank you. I hope the Aviation High School learned something today from the exceptional attorneys. We'll reserve the decision and we'll hear argument in SBD as consolidated case numbers 242778 and 251618. Thank you. Good morning. Good morning. May it please the Court. Rajiv Dosanjh for the United States. The compassionate release statute is an exception to the bedrock rule of finality in sentencing, and for that reason, this Court and others have emphasized that its terms must be construed narrowly. So how much time did this man spend in penitentiary, all told? He spent 28 years in state custody and four years in federal custody. Okay. And so for the 2553, 3553 factors to have been faithfully applied in this case, how much time should he be spent? Your Honor, it's the government position that the sentence required by the or mandated by the guidelines originally and recommended by the guidelines now is the appropriate sentence. That's what, 60 years? It's a life term of imprisonment, Your Honor. So he was transferred from parole in New York or transferred from custody in New York and paroled to federal custody to begin serving a life term. So that is what the government believes is the appropriate sentence. Now, obviously I can't stand here and say that a district court does not have discretion under the compassionate release statute to lower that based on changed circumstances. Do you believe that Judge Hurd abused his discretion in the sentencing that he posed? Under these circumstances, yes, Your Honor, because if you – it's not an exaggeration to say here that Mr. Diaz served no time for the murder of Michael Monsoor in federal – the federal crime that he was convicted of and received life term from by the jury. The jury – he was – we sought the death penalty originally. The jury granted him mercy and said no under the belief that he would be serving a life term as argued to the jury. Do you think it was a miscarriage of justice not to execute this man? Your Honor, no, but I – Sorry? No, but it's – Your Honor, it's – that was the jury's prerogative to decide, and they did decide based on arguments that he would spend a life term in federal custody. Could the sentencing judge have imposed that life term concurrent with any future State sentences to be imposed? At that time, he could have. Okay. So – so the jury – this idea that somehow by imposing a life sentence the jury was – we have to honor the jury's verdict by – on the penalty phase by not allowing concurrent sentences, that doesn't – that doesn't hold up, right? Well, Your Honor, it's – it's – I want to be clear. What we're arguing here is that the consecutive nature of the sentence was final. That's part of the – that's the – that's the finality part of this. And so it was a life sentence? It's a life sentence, but the Compassionate Release Statute allows the judge to reduce the term of imprisonment. So he could have reduced it to four years? Your Honor, he could have, but we think it would have been an abusive – it is an abusive discretion. And again, I want to emphasize – It would have been substantively unreasonable and in that way an abusive discretion? Yes, Your Honor, and also the way he did it in this case. No, I understand the way you're saying the way he did it in this case. But if – hypothetically, if we said, you know what, the way you did this isn't okay, remand and reconsider, the judge could say, I think, all right, I've reconsidered, I'm giving him four – I'm reducing his sentence from life to four years. He could, Your Honor, and he would have to explain it. That's the – Right. He did explain it. He said he would – that's the result he would come to if he got it again. Your Honor, if you look at what he said in his sentencing reduction order, everything he said about the 3558 3A factors was justifying a 421 sentence. He ignored the fact that that was consecutive. He couldn't change that. And so if he wanted to reach this result, he would have had to give Mr. Diaz time served, which is what they asked for. He was uncomfortable doing that. He did not justify that reduction. He justified a much more modest reduction from life to 35 years. So we don't actually know. Where did he spend these 35 years? So the 28 years of those – of that time was spent in State custody. Where? Your Honor, actually, off the top of my head, I do not know which State facilities he was in. And so – but I – again, Your Honor, he was released to custody of the Federal Government, and BOP took custody of him. And again, I want to emphasize something. He – the judge did not change the five-year consecutive term for the – just for the 924C offense. So effectively, he has not served any time for killing Michael Monsoor. So what is it? What is it? What do you mean he hasn't served? The man spent 35 years in jail. For the murder of another person in New York City, for Bonnie Baer's murder. That was not prosecuted by – and the Federal Government could not prosecute that case. It was – that was prosecuted by the State of New York, which had the right to determine how much time he should spend for that offense alone. And it did under the belief – You didn't want – you thought it was an abuse of discretion for Judge Hurd to, you know, look at how much time this man had spent, how much time he had coming and say, you know, 35 years locked up in a state penitentiary under – considering the compassionate release standards and issues was enough. You think he just screwed this up? Well, Your Honor, I mean, to use your words, I think he clearly screwed this up because he was using the – The answer is yes, Your Honor. He used the compassionate release statute in a way that I think was – he was trying to get around having to do what they asked him to do, which was reduce a life term to either four years or what I believe for the murder of Michael Monsoor was effectively a zero term. And he didn't want to do that. So he found a way that's not contemplated by the – So what is it that you want? What is it that you want? What we want is to be – we want it to be remanded to the district court with the clear instruction that he cannot give credit, he cannot run – he cannot change any other aspect of this term except that he can reduce the amount – the term of imprisonment for each offense, which is what he actually did in his judgment. He went through each count of conviction and reduced it. But he then did this credit thing first and then – Crediting a discharged term. Right. It was clearly illegal. And then he has no authority to run the – to change the way the judgment ran. His only authority – and this is, again, why finality is such an important kind of background here. The compassionate release statute allows you to do one thing. And so he could do that one thing. And I have no doubt. Sorry. What is that one thing? So he can reduce the term of imprisonment. Now, if he wants – I can't stand here and say – When you say the term of imprisonment. For each offense that he was convicted of federally. And I can't stand here and say that somehow Judge Heard is going to change his mind about wanting Mr. Diaz to be released. But he's going to have to explain that decision with reference to the 3558-3A factors. And then we will – the government will have an ability to assess whether an appeal is appropriate in that case. Fundamentally, this is as I understood your argument going in, but then I think you get a little blurred. You just want a justification, an actual explanation on the record. For – if he wants to give time served, why is that appropriate when he never served any time in the state prison for the murder of Michael Monsoor? Now, I understand. But he served 35 years in jail. In state prison. So you want him to clean up his paperwork. It's both more than that, Your Honor. A little bit more – to clean up his paperwork. But the government, if I understand you correctly, is not objecting to the fact that Judge Heard thought that 35 years was enough. Your Honor, we are objecting to that. Because – You say more was required. Yes. How much more was required? Your Honor, again, the government's position is that Mr. — The government's position is he should never get up. Your Honor, the government's position is that under the circumstances he presented and the reasons that were given, there was not enough of a justification to reduce his term. That was an inadequate justification? That's what — For – it was inadequate because he was justifying – first of all, he was justifying the wrong thing. He was justifying a 420-month term. And again, Judge Heard has never backed a time-served sentence. He – what he did was – I'm – I want to say I gave him 35 years for the murder of Michael Monsoor, the drug trafficking, and the gun crime. But he actually did not do that. And he never really justified why it was appropriate to give him credit or to run these two very different crimes, those – the terms consecutively. So suppose – suppose he had given him 10 more years, 45 years, and not life. I take it the government's position would still be that that was improper. Is that right? Your Honor, it would – again, Your Honor, it's – understand, like, I have to make clear, it's the judge to determine what's appropriate. It's us for determining. It's the judge who determines what's appropriate in that sense. But the government has a chance to, based on his justification, to see whether that's sufficient and whether we think it's not to try to appeal. Suppose we give him 10 more years, 45 years. Would that have satisfied the 35, 53 factors, or would that have been a determination that would have gotten him back up here on another appeal? So, again, Your Honor, we have – when we make a recommendation to appeal and the Solicitor General gives approval, it's based on our likelihood of success. And I want to say, I understand that if he had given him 10 more years or if he had kept him in prison longer, that we likely would not have been able to convince. But that's discretionary. I'm asking you a somewhat different, I guess, hypothetical question. Would the 10 more years have satisfied the 35 factors, or should – Well, the government's position is no. The government's position was – I think you told me that the government doesn't think it was a miscarriage of justice that the guy wasn't executed, right? Right. Okay. So if you'd given him 10 more years, would that have satisfied the government? Again, Your Honor, no, because we believe for two murders – No, 15 more years. Again, we believe in life. We believe in life. He's got a 50-year sentence, and you don't – Again, he didn't get a 50-year sentence, Your Honor. No, this is hypothetical. 50 years in Dannemora doesn't satisfy your office? He's – again, he's being – he had been prosecuted by the State of New York for a separate crime, a cold-blooded killing on the streets of Manhattan that had nothing to do with the Federal offense. He was the same – it was the same person. He was carrying the same gun, but it had nothing to do with what the Federal government had prosecuted. It wasn't relevant conduct. And the only way it was related was that it happened to involve the two same people. But, again, like, so if you're thinking about the murder of Michael Monsoor, it's the government's position that the life term for that offense was appropriate, and that in the – it's appropriate also, I will grant, because he did commit another murder, but that's being prosecuted by a separate sovereign. And so when you say a 50-year sentence – Horrible crime spree. And – I will agree, Your Honor, it was a horrible crime spree. But I'll also say that it was not as if these were impulsive crimes. He planned with Tyrone Walker the execution of Michael Monsoor. They knew that they were going to do that. Terrible murders. No question about that. We're not talking – nobody's justifying that. We're just talking about the government's position that, you know, 35 years in Dannemora didn't get it done. Ten more years – But he wasn't in Dannemora for the murder of Michael Monsoor. He was in Dannemora for the killing of Bonnie Bear in Manhattan. So you would ask us to assign error in two ways, as I understand it. This is an assumption.